**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Chapter 11 |
| PTC SEAMLESS TUBE CORP. f/k/a<br>PTC ALLIANCE PIPE ACQUISITION LLC, | Case No.  15-21445 |
| Debtor. | |

**DECLARATION OF PETER WHITING IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST DAY MOTIONS**

COMMONWEALTH OF PENNSYLVANIA  )
                                      ) ss.
COUNTY OF ALLEGHENY                  )

        Peter Whiting being duly sworn, deposes and says:

        1.        I am Chief Executive Officer of PTC Seamless Tube Corp. f/k/a PTC Alliance Pipe Acquisition LLC, the debtor and debtor-in-possession ("Seamless" or the "Debtor") in the above-captioned chapter 11 case (this "Chapter 11 Case").  The Debtor is a corporation organized under the law of the State of Delaware and a wholly owned subsidiary of PTC Group Holdings Corp. ("PTC Group"), a Delaware corporation.  As a result of my work with the Debtor, my review of public and non-public documents, and my discussions with the Debtor's management team and employees, I am familiar with the Debtor's day-to-day operations, business affairs, and books and records and, therefore, the facts set forth herein.

        2.        Except as otherwise indicated, the facts set forth in this declaration (this "Declaration") are based on my personal knowledge, my review of relevant documents, and information supplied to me by others.  Any opinions contained herein are based upon my personal experience, knowledge, and information concerning Seamless.  If called upon to testify, I will testify competently to the facts set forth in this Declaration.

US_ACTIVE-121792762

3.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

(the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western District of

Pennsylvania (the "Bankruptcy Court").

4.    The Debtor intends to continue in possession of its property and to manage

its business as a debtor in possession in accordance with Bankruptcy Code sections 1107 and

1108.  Further, to enable the Debtor to minimize the adverse effects of the chapter 11 filing on its

business, the Debtor intends to request certain relief in "first day" applications and motions

(collectively, the "First Day Motions").  I submit this Declaration in support of the Debtor's

chapter 11 petition and the First Day Motions.  This Declaration is intended also to provide an

overview of Seamless's history and business, including the circumstances leading to the chapter

11 filing.

5.    Part I of this Declaration describes the Debtor's business and the

circumstances surrounding the commencement of this Chapter 11 Case.  Part II of this

Declaration sets forth the relevant facts in support of the First Day Motions concurrently filed

herewith.  Part III of this Declaration sets forth the relevant facts in support of a "second day"

motion related to insurance concurrently filed herewith.

## I.    BACKGROUND

### A.  The Debtor's and PTC Group's Business Operations

6.    PTC Group and its subsidiaries (collectively, "PTC") are leading

manufacturers and marketers of steel tubing, tubular shapes, bar products, fabricated parts, and

precision components.  PTC was formed in 2000 by the merger of the Pittsburgh Tube Company

and J.H. Roberts Industries, Inc.

7.      As a general matter, there are two basic types of steel tube:  welded and seamless.  The processes for making welded and seamless tubular steel differ dramatically, as do the end uses and customers.

a.      Welded steel tubes are made through a variety of processes dictated by the intended application of the tube.  Typically, steel is rolled or uncoiled into a flat shape, formed in rolling mills or fin-pass mills into a tubular shape, and finally welded at the seam to form a tube.  End uses of welded tubes include hydraulic cylinders, tubes and rods for earth moving equipment, dump trucks, forklift trucks, mining equipment, agricultural machinery, and automobiles, among other things.

b.      Seamless steel tubes, by contrast, are produced in a very different type of integrated plant, using different milling equipment.  In a seamless tube plant, a hot steel billet supplied by a rotary hearth furnace is sent to a piercing mill where the billet is pierced in the center to create a hole and draw the billet out to form a seamless tube.  The tube then is processed through a number of other mills and equipment, like a pilger mill (which controls the interior diameter of the tube), for forming and finishing.  Seamless tubular products have a wide-variety of end uses including tubes for oil and gas mining operations (known as oil country tubular goods or OCTG), casings, standard and line piping, and other pressure sensitive applications.

8.      PTC Group has two direct subsidiaries, the Debtor and PTC Alliance Corp. (together with its subsidiaries, "Alliance").  The Seamless and Alliance businesses are entirely different.  Alliance has welded steel operations in Pennsylvania, Illinois, Indiana, Missouri, and Ohio.  Its customers include steel service centers, original equipment

manufacturers (OEMs), and tier 1, 2, and 3 automotive suppliers.  Prior to 2012, PTC had no seamless tube operations.

9.      Historically, PTC's business focused solely on welded steel tubing, manufactured and fabricated by Alliance and its subsidiaries.   PTC created Seamless to enter into the seamless tube market, a new type of manufacturing for PTC.  As demonstrated by the following organizational chart,  Seamless is the only entity in this line of PTC's steel tube businesses:



10.     Seamless's executive and financial operations (as well as those of Alliance) are based in Wexford, Pennsylvania.  Seamless has a single plant located in Hopkinsville, Kentucky, which is under construction.  Seamless has a sales and administration office in Houston, Texas.

11.     As of the Petition Date, the Debtor has nineteen (19) full-time employees, of which fourteen (14) are salaried and five (5) are hourly.  None of the Debtor's employees are represented by unions.

### B.  Seamless's Capital Structure

12.     As of the Petition Date, Seamless's total funded secured debt obligations were approximately $160,800,000, which obligations consist of a revolving credit facility payable to Wells Fargo Bank, National Association (the "ABL Lender") and a term loan facility payable to certain lenders (collectively, the "Term Loan Lenders") for which Credit Suisse AG, Cayman Islands Branch serves as administrative and collateral agent (the "Term Loan Agent"). These obligations are described in greater detail below.

a.  The ABL Credit Facility.  On or about December 19, 2012, the Debtor and certain of PTC's subsidiaries, as borrowers; the institutions from time to time party thereto as lenders, *i.e.*, the ABL Lender; and Wells Fargo Bank, National Association, as administrative agent and collateral agent to the ABL Lender, entered into a Credit Agreement (the "ABL Credit Agreement"), providing a revolving credit facility in an aggregate principal amount not to exceed $75,000,000 (the "ABL Facility").  The ABL Facility is secured by liens on and security interests in substantially all of the assets of the Debtor and remaining PTC borrowers, with first priority liens on and security interests in certain assets of the Debtor, *e.g*., inventory and receivables, and second priority liens on and security interests in assets which the Term Loan Lenders have first-

priority liens and security interest (described more fully below).  As of the Petition Date, the

outstanding principal obligations under the ABL Facility were $43,800,000.

b.  The Term Loan Facility.  On or about December 19, 2012, PTC Group,

as borrower; PTC Holdings II Corp. (the parent of PTC Group); the institutions from time to

time party thereto as lenders, *i.e.*, the Term Loan Lenders; and the Term Loan Agent, as

administrative and collateral agent for the Term Loan Lenders, entered into a Credit Agreement

(the "Term Loan Agreement"), providing for a credit facility in the aggregate principal amount

not to exceed $120,000,000, which consisted of two tranches of loans (the "Term Loans") in the

amounts of $70,000,000 and $50,000,000 maturing on December 19, 2016 and December 19,

2018, respectively.  The Debtor guaranteed the Term Loans, pursuant to the *General Continuing*

*Guaranty* dated December 19, 2012, made by the Debtor and certain PTC entities as guarantors

in favor of the Term Loan Agent for the benefit of the Term Loan Lenders.  The Term Loans are

secured by liens on and security interests in substantially all of the assets of the Debtor and PTC

guarantors, with first priority liens on and security interests in certain assets of the Debtor, *e.g.*,

real property and equipment, and second priority liens on  and security interests in the assets

which the ABL Lender has first-priority liens and security interest.  As of the Petition Date, the

outstanding principal obligations under the Term Loans were $117,000,000.   The Term Loan

Lenders and their proportionate share of the loans are set forth in the Debtor's Schedule D.  The

Term Loan Lenders with the largest shares of the Term Loans include:  Black Diamond Capital

Management LLC affiliated entities and Redwood Capital Management, LLC affiliated entities.

13.    PTC Group operates a centralized cash management system for itself and

the PTC subsidiaries.  Historically, Seamless's operations and capital expenditures were funded

by loans made by PTC Group.  Such loans were funded by a combination of PTC revenues and

draws on the ABL Facility.  Each loan was booked on PTC Group's and Seamless's books.  The

total pre-petition amount due to PTC Group is approximately $80 million.

### C.  The Seamless Steel Tube Market

14.    PTC viewed the seamless tube market as a potential area of growth for the

PTC business.  PTC discovered an opportunity to enter the seamless market in 2012 through the

purchase of a dormant steel tube plant in Croatia.  PTC formed Seamless, then known as PTC

Alliance Pipe Acquisition LLC, as a separate corporate entity to acquire the seamless plant from

a subsidiary of Commercial Metals Company and relocate it from Croatia to North America.

PTC believed that this acquisition would give it a foothold in the seamless market for

substantially less investment than would be required to build a seamless mill from the ground up.

15.    In June 2012, Seamless consummated its purchase of the assets of the

Croatian seamless tube plant for approximately $6.3 million.  In connection therewith, it

developed a strategy for dismantling, refurbishing, relocating, and installing the seamless plant in

North America.  The dismantling, refurbishing, and relocating process took nearly a year and

involved third-party specialty engineering companies.  Seamless estimated that the total cost of

this project would be approximately $68 million and that Seamless would produce tubes in

September 2014.

16.    Seamless scouted various locations throughout North America for the

seamless mill, including locations in Alabama, Kentucky, Mississippi, Texas, and Mexico.

Ultimately, Seamless selected a site in Hopkinsville, Kentucky, where PTC formerly operated a

facility dedicated to making specialty welded tubes for the automobile industry.  A complete

overhaul of the Hopkinsville site was needed to accommodate the seamless mill equipment.

17.    Seamless solicited bids for the renovation of the Hopkinsville plant and, in

the May of 2013, signed a contract with Robinson Mechanical Construction, Inc. d/b/a Robinson

Construction Company ("Robinson") for this limited purpose. Robinson performed the initial preparation work on time. Meanwhile, the refurbished segments of the plant were shipped from Europe to Kentucky for installation.

### D. Events Leading To This Chapter 11 Case

18.    Overruns in the cost and delays in time for construction and installation of Seamless's plant in Hopkinsville, Kentucky are the primary cause of this Chapter 11 Case. The overruns are the subject of a breach of contract suit filed by Seamless against Robinson, as the primary contractor for the project, which is currently pending in this District at Case No. 2:15-cv-00433-MRH (the "District Court Action").

19.    Although the Robinson dispute is not the subject of the First Day Motions, a brief discussion of that dispute is helpful to understand the events that precipitated Debtor's filing of this Chapter 11 Case.

20.    As set forth more fully in the complaint filed in the District Court Action, Robinson's initial renovations for the plant were satisfactory; therefore, it was offered an opportunity to bid on Phase I of the project, which encompassed substantially all equipment installations needed to produce seamless tube. Ultimately, Robinson was awarded a contract for Phase I to be completed on a time and materials basis. Robinson estimated that its work on Phase I would cost Seamless approximately $25 million through completion and that the project would be completed by September 16, 2014.

21.    After construction commenced, Robinson failed to perform as promised. Robinson represented that it had the requisite skill and manpower to complete the project, and Seamless relied upon those representations in selecting Robinson as the general contractor. Seven months after the target completion date, Robinson is significantly over budget and Phase I still is not complete.

22.     Consequently, the Debtor recently solicited competing bids to complete installation for one piece of equipment within Robinson's existing scope of work, the pilger mill. The bidders on the pilger mill installation estimated the work would take significantly less time and money than Robinson has estimated for the same scope of work.

23.     On March 11, 2015, Seamless notified Robinson that, in accordance with certain provisions in the parties' agreement, it disputed the amounts Robinson has invoiced Seamless and that Seamless was exercising its audit rights under the contract. In this proceeding and the District Court Action, Seamless seeks to remedy the excessive billing to date and recover the damages sustained as a result of Robinson's conduct. As of the Petition Date, Robinson's invoices disputed by Seamless total more than $14 million.[1]

24.     The delays and cost overruns caused by Robinson have created liquidity issues for Seamless. Although Robinson has provided estimates for the remaining costs and time required to complete the project, Robinson's estimates have been unreliable. Seamless currently estimates that it could take an additional three months until Phase I construction is completed; however, more time is needed to confirm the accuracy of its estimates. Likewise, Seamless needs additional time to evaluate how much additional investment is needed to complete Phase I. Under the circumstances, neither Seamless's parent, PTC Group, nor its ABL Lender is willing to make additional advances to Seamless to complete construction of the plant.

25.     The significant cost overruns caused by Robinson together with Seamless's limited liquidity and inability to produce income because Robinson's installation of the plant is incomplete have left Seamless with insufficient funds to pay its debts as they come

---

[1]     On or about April 3, 2015, Robinson filed a *Statement of Mechanic's Lien* against Seamless's Hopkinsville real property in the amount of $13,504,556.82. Seamless disputes this lien. Since that time, Robinson has invoiced Seamless an additional $700,000, approximately.

due.  In an effort to address the financial challenges that it faces, the Debtor has undertaken

significant efforts to reduce expenses.  In February 2015, the Debtor reduced its work force.[2]

Since that time, the Debtor has reduced its work force further.  All work on the project has been

idled.  The Debtor also solicited alternative bids for the completion of Phase I of the project on a

fixed-sum, rather than time and materials basis, to provide the Debtor with certainty as to the

cost of the remaining work.

      26.     The Debtor commenced this Chapter 11 Case to provide breathing room

while it pursues additional financing to enable it to complete construction of the plant to enable it

to produce tube or, alternatively, to sell substantially all of its assets through a section 363 sale.

The Debtor's objective is to develop a strategy that allows it finance the construction of the

project pending formulation of a plan of reorganization, whether as a standalone or through a

sale process designed to maximize recovery for its creditors.

## II.     <u>SUMMARY OF FIRST DAY MOTIONS</u>

      27.     To enable the Debtor to operate effectively in this Chapter 11 Case, the

Debtor has filed, or intends to file as soon as practicable after the Petition Date, the First Day

Motions described below.  In connection with the preparation of this Chapter 11 Case, I have

reviewed, or will review prior to their filing, each of the First Day Motions.  I believe the

information contained in the First Day Motions is accurate and correct.  As set forth more fully

below, I believe the entry of orders granting the relief requested in these motions and

applications is critical to the Debtor's ability to preserve the value of its assets and will assist in

its reorganization efforts.

---

[2]     On or about March 26, 2015, the Seamless and PTC Group were sued in the United States District Court for the Western District of Kentucky for alleged violations of the Worker Adjustment and Retraining Notification Act  (the "<u>WARN Act</u>").  Seamless believes the claims to be without merit.  Seamless's deadline to respond to the Complaint, prior to the initiation of this Chapter 11 Case, was May 4, 2015.  The WARN Act suit is encaptioned *Eckelkamp v. PTC Seamless Tube Corp., et al.*, Case No. 5:15-cv-73-TBR.

### A.  Prepetition Employee Claims and Benefits

28.     As of the Petition Date, the Debtor's workforce consisted of nineteen (19)

employees (the "Employees").  Fourteen (14) Employees are salaried and the remaining five (5)

Employees are paid on an hourly basis.  The salaried Employees are paid twice monthly, on the

15th and the last day of the month.  Hourly Employees are paid bi-weekly.  In addition, during

the course of the year, Employees accrue vacation, earned leave, personal time, and holiday pay,

which may be paid in the ordinary course of the Debtor's business during the calendar year.

29.     Automatic Data Processing, Inc. ("ADP") processes the Debtor's payroll

by drafting payroll checks and processing ACH payments into Employees' bank accounts.  ADP

withdraws the necessary amount to cover the Debtor's payroll from a zero balance account tied

to the Concentration Account maintained by the Debtor's parent company, PTC Group, by ACH

reverse wire transfer. [3]  Though the Debtor has remained current on its payroll, as of the Petition

Date, the Debtor owed its Employees compensation in the form of accrued but unpaid wages and

salaries in the aggregate amount of approximately $124,891.94 (including payroll taxes).  The

Debtor seeks authority to pay such accrued compensation as it becomes due and owing in the

ordinary course of the Debtor's business operations.

30.     On April 23, 2015 (the "Termination Date"), the Debtor reduced its

workforce and terminated the employment of thirteen (13) employees (the "Former

Employees").  As of the Petition Date, the Former Employees are each owed compensation in

the form of accrued but unpaid wages and salaries for the period commencing with the first day

of the last pay period and terminating on the Termination Date in the aggregate amount of

---

[3]     The Debtor is in the process of opening its own post-petition payroll account that is separate and distinct
from the Parent's cash management system.  Once opened, future payroll will be paid from the new post-petition
account.

approximately $53,410.13 (including payroll taxes).  Because the Debtor has no liquidity, the

Debtor intends to use its bridge financing to pay its prepetition employee obligations.

31.     The Debtor's policy is to reimburse Employees for certain expenses within

the scope of their employment, including expenses for travel, lodging, meals, supplies, and other

miscellaneous expenses.  The Debtor estimates that, as of the Petition Date, less than $10,000.00

was owed to Employees and Former Employees on account of outstanding reimbursable business

expenses.  The Debtor seeks authority to pay such accrued prepetition reimbursement amounts.

32.     The Debtor offers a severance program to its salaried employees (the

"Severance Benefits").  Although the severance payments vary on a case-by-case basis per

salaried employee, generally, the payments consist of one week's pay for each year of

employment.  The Debtor seeks authority to maintain the Severance Benefits for the benefit of

the salaried Employees and Former Employees at its sole discretion.

33.     The Debtor offers its Employees many standard employee benefits under

its employee benefit programs (the "Employee Benefit Plans and Programs").  The Debtor's

full-time Employees are offered a choice of medical plans, prescription drug, dental insurance,

vision insurance, life insurance, accidental death and dismemberment, long-term disability

insurance, flexible spending accounts, COBRA, and a 401(k) program.  It also offers voluntary

insurance plans for critical illness and cancer, group accident, and disability income, which are

paid entirely by the Employees.

34.     The Debtor self-insures medical benefits for the first $250,000 in claims

per person per year for most of its Employees.  The Debtor's claims administrator and stop-loss

insurance carrier is Highmark Blue Cross Blue Shield ("Highmark").  Express Scripts, Inc.

("Express Scripts") acts as a third party administrator (the "TPA") for the self-insured

prescription drug plan.  In addition to paying the cost of the actual medical claims up to the stop-loss amount, the Debtor also pays Highmark administrative fees in the approximate amount of $110.93 per employee per month, which covers fees for Highmark, fees for Express Scripts, fees for the Debtor's employee benefits consultant, Henderson Brothers, Inc. ("Henderson"), and fees for special services such as short-term disability, claims processing, large case utilization reviews and stop loss premiums.  The Debtor also offers its Employees dental benefits (and together with the medical and prescription drug plans, the "Self-Insured Employee Benefit Plans").

35.     Under the medical benefit plans, Employee expenses are submitted to Highmark, which aggregates these expenses into one weekly claim, and each week the Debtor wires the aggregate expense to Highmark from PTC Group's operating account and the Debtor's portion is then allocated to it through an intercompany charge.  Highmark issues payments to the various medical or other benefit providers for expenses incurred under the benefit plans.  Given the nature and timing of the method by which claims are submitted under the Self-Insured Employee Benefit Plans, it is difficult to estimate the amount of such claims that were incurred prior to the Petition Date.  Accordingly, the Debtor seeks authority to honor all obligations, including claims incurred prior to the Petition Date, under the Self-Insured Employee Benefit Plans.  The chart below summarizes the Debtor's average monthly obligations for its Self-Insured Employee Benefit Plans:

| BENEFIT | ADMINISTRATOR | AVERAGE MONTHLY COST |
|---|---|---|
| Medical PPO | Highmark Blue Cross Blue Shield | $31,080 |
| Prescription Drug | Express Scripts, Inc. | $12,973 |

36.     The Debtor also participates in the PTC Group 401(k) Plan (the "401(k) Plan").  The 401(k) Plan is administered by PTC Group and the Plan Trustee is Wells Fargo

Bank, N.A. ("Wells Fargo").  Henderson, the Debtor's employee benefit consultant, receives a

fee of $12 per participant per year.  The Debtor withholds Employee contributions for the 401(k)

Plan on a per pay period basis.  Wells Fargo sweeps the funds from PTC Group's account via

ACH transfer approximately one to two business days after the pay period ends.  The 401(k)

Plan is a safe harbor plan and under the plan the Debtor matches 100% of the first 3% of the

Employee contributions and 50% of the next 3% of Employee Contributions.  The match is made

during each payroll period and the match is immediately 100% vested.

     37.     The States of Texas and Kentucky require the Debtor to provide workers'

compensation insurance.  The Debtor provides workers' compensation insurance through a

policy maintained by PTC Group with Phoenix Insurance Company ("Travelers").  PTC Group

pays an upfront premium and pre-funding amount to Marsh USA Inc. ("Marsh") for the benefit

of Travelers prior to the beginning of each new policy year based upon estimated employee

hours for such policy year.  Following completion of the policy year, the premiums are audited

against actual hours worked and claims made, and the reconciled amount may result in an

additional payment to or refund from Travelers.  These upfront premiums, pre-funding amount,

and additional charges or refunds will then be allocated by PTC Group to the Debtor through the

intercompany account.  For the current policy year, the Debtor is to pay Marsh, for the benefit of

Travelers, an upfront premium and pre-funding payment in the amount of $43,662.  In addition,

the Debtor is to make ten (10) monthly premium and pre-funding payments in the amount of

$21,831.

     38.     It is critical that the Debtor be permitted to continue to receive coverage

under PTC Group's workers' compensation program and to pay any reconciled balances and

premiums for the new policy year, because alternative arrangements for workers' compensation

coverage would almost certainly be more costly, and the failure to provide coverage might

subject the Debtor and/or its officers to severe penalties.  In addition, failure to pay workers'

compensation claims might result in Employee attempts to compel payment through litigation or

similar means and jeopardize the Debtor's ability to conduct business in Texas and Kentucky.

Accordingly, the Debtor seeks authority to continue paying premiums, pre-funding amounts, and

any additional charges resulting from yearly reconciliations related to workers compensation.

39.     The Debtor is requesting that this Court enter an order:  (i) authorizing the

Debtor to pay or otherwise honor various employee-related prepetition obligations of the Debtor

to, or for the benefit of, the Employees and the Former Employees, (ii) authorizing the Debtor to

continue post-petition the Employee Benefit Plans, and (iii) directing all banks to honor

prepetition checks for payment of the Debtor's Prepetition Employee Obligations and allowing

the Debtor to use Bridge Financing for the payment of Prepetition Employee Obligations.

**B.  Utilities**

40.     In the ordinary course of business, the Debtor regularly incurs expenses

for electricity, natural gas, water, telephone, telecommunications, and other utility services

(excluding amounts claimed or owing other than for actual services, the "Utility Services")

supplied by various service providers (the "Utility Providers").  The aggregate average monthly

charges for the Utility Services provided by the Utility Providers over the six (6) months

immediately preceding the Petition Date are approximately $35,500.00.  In many instances, the

provision of Utility Services by the Utility Providers is governed by applicable federal or state

tariffs or by certain service agreements.

41.     The Debtor typically pays the invoices issued by the Utility Providers on a

monthly basis.  Historically, the Debtor has been timely in the payment of its bills for Utility

Services.  Due to the timing of the Debtor's bankruptcy filing, it is possible that:  (i) certain

prepetition Utility Services remain unpaid because they were not billed prior to the Petition Date; or (ii) payment of certain prepetition invoices did not clear prior to the Petition Date.

42.    The Debtor intends to pay all post-petition obligations owed to the Utility Providers for Utility Services in a timely manner.  Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtor will deposit $35,465.15 (the "Adequate Assurance Deposit"), equal to the average monthly cost of Utility Services over the six (6) months immediately preceding the Petition Date, into a newly created, segregated, interest-bearing account, within the later of twenty (20) days of the Petition Date and ten (10) days of the entry of the interim order approving the motion to approve adequate protection payments to Utility Providers (the "Utility Motion").

43.    Prior to the Petition Date, the Debtor entered into an Industrial Power Contract with Pennyrile Rural Electric Cooperative Cooperation ("Pennyrile"), pursuant to which Pennyrile agreed to make available to the Debtor, and the Debtor agreed to take and buy from Pennyrile, a specified amount of power and energy, known as the "contract demand" for the Debtor's facility, regardless of the Debtor's actual energy needs.  Historically, the "contract demand" has far exceeded the Debtor's actual monthly energy usage.  Pennyrile monthly invoices also include an amount relating to the construction of a substation near the Debtor's facilities.  For purposes of calculating the proposed adequate assurance deposit on account of Pennyrile, the Debtor did not include the minimum "contract demand" or amounts relating to the construction of the substation as these amounts are unrelated to the actual energy used by the Debtor.  For purposes of the Utility Motion, the minimum "contract demand" and amounts relating to the construction of the substation are not considered Utility Services.

44.     The Utility Providers administer essential services that are crucial to the continued operations of the Debtor.  The temporary or permanent discontinuation of Utility Services could irreparably disrupt the Debtor's business operations and, as a result, fundamentally undermine the Debtor's reorganization efforts.  The continuation of the Utility Services is necessary to enable the Debtor to continue its business operations uninterrupted by threats of potential termination or suspension of, or interruption in, its Utility Services.

45.     I have been advised by counsel that section 366 of the Bankruptcy Code prevents a utility from altering, refusing, or discontinuing service if, within 30 days of the petition date, the debtor provides the utility service with adequate assurance of payment that is satisfactory to the utility.  11 U.S.C. § 366(c)(2).  Counsel has further advised that adequate assurance of payment can take the form of:  "(i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of security that is mutually agreed on between the utility and the debtor or the trustee."  11 U.S.C. § 366(c)(1)(A).

46.     The Debtor fully intends to pay all post-petition obligations owed to the Utility Providers for Utility Services in a timely manner and, by virtue of its bridge and anticipated debtor-in-possession financing, expects that it will have sufficient funds with which to satisfy fully all of its post-petition Utility Service obligations.  Further, the Debtor represents that its bridge and anticipated debtor-in-possession financing will enable the Debtor to pay promptly all of its obligations to the Utility Providers for post-petition Utility Service on an ongoing basis in the ordinary course of business.

47.     Nevertheless, to provide additional adequate assurance of payment to the Utility Providers, the Debtor proposes depositing the Adequate Assurance Deposit into a

segregated, interest bearing account within the later of twenty (20) days of the Petition Date and

ten (10) days of the entry of the interim order approving the Utility Motion.  The Adequate

Assurance Deposit will be maintained during this Chapter 11 Case with a minimum balance

equal to the Debtor's average monthly cost of Utility Services over the six (6) months

immediately preceding the Petition Date, which may be adjusted by the Debtor to account for the

termination of Utility Services by the Debtor or other arrangements with respect to adequate

assurance of payment reached with the individual Utility Providers.

### C.  Section 345 Waiver

48.     In compliance with the "Operating Guidelines for Chapter 11 Cases" (the

"Guidelines") of the Office of the United States Trustee, Thomas Crowley, Vice President and

Chief Financial Officer of the Debtor, will open new, debtor-in-possession bank accounts (the

"Post-Petition Bank Accounts") with JPMorgan Chase Bank, National Association (the "Bank")

or another bank on the United States Trustee's list of approved depository institutions for use in

its business operations, the payment of taxes, and the segregation of cash collateral.  After the

Post-Petition Bank Accounts are established, the Debtor will close its prepetition bank accounts.

49.     In further compliance with the Guidelines, the Debtor will take the

appropriate steps to ensure the Post-Petition Bank Accounts unambiguously reflect that they are

debtor-in-possession accounts.  Among other things, the Debtor will order new checks for the

Post-Petition Bank Accounts with "*Debtor-in-Possession, In re PTC Seamless Tube Corp., Case

No. 15-[_____] (Bankr. W.D. Pa.)*" printed on them.

50.     I have been advised by counsel that section 345 of the Bankruptcy Code

governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes

deposits or investments of money as "will yield the maximum reasonable net return on such

money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  For

deposits or investments that are not "insured or guaranteed by the United States or by a

department, agency, or instrumentality of the United States or backed by the full faith and credit

of the United States," section 345(b) requires the estate to obtain from the entity with which the

money is deposited or invested a bond in favor of the United States that is secured by the

undertaking of an adequate corporate surety, unless the Court for cause orders otherwise.  11

U.S.C. § 345(b).

51.    The Debtor believes that funds deposited and held in the Post-Petition

Bank Accounts are secure and that obtaining bonds to secure those funds, as required by section

345(b) of the Bankruptcy Code, is unnecessary and detrimental to the Debtor's estate and

creditors.  The Debtor submits that "cause" exists pursuant to section 345(b) of the Bankruptcy

Code to waive this section's requirements because, among other considerations, (i) the Bank is a

federally chartered bank subject to supervision by federal banking regulators, (ii) the Debtor

retains the right to remove funds held at the Bank and establish new bank accounts as needed,

(iii) the costs associated with satisfying the requirements of section 345 are burdensome, and

(iv) the process of satisfying the requirements would lead to needless inefficiencies in the

management of the Debtor's business.

**D.  Bridge Financing**

52.    As discussed above, due to the uncertainty with timing and costs to

complete construction of Phase I of the Hopkinsville plant, PTC Group is unwilling to continue

to fund Seamless.  The Debtor has filed this Chapter 11 Case to obtain breathing room from its

creditors so that it may better evaluate what will be required to finance and complete Phase I of

the project.  Ultimately, the Debtor believes that completing construction to enable the plant to

produce tube will provide the greatest recovery to the estate and its creditors.

53.     The Debtor and its financial advisor, Candlewood Partners, LLC, are

soliciting potential DIP lenders.  While the Debtor has been negotiating terms of a potential DIP

facility with several potential lenders, the Debtor has not completed solicitation of and

negotiation with potential lenders and, therefore, is unable to seek approval of a DIP facility at

this time.  The Debtor may need up to two weeks to complete this process, but the Debtor has no

liquidity to fund operations during this time.

54.     Under these circumstances, PTC Group has agreed to extend limited

bridge financing on an ***unsecured*** basis to the Debtor in the principal amount of $650,000 (the

"Bridge Facility"), provided that such financing is entitled to administrative priority treatment

under section 503(b)(1) of the Bankruptcy Code in accordance with section 364(b) of the

Bankruptcy Code.  The Bridge Facility was extended by PTC Group in good faith with PTC

Group represented by separate counsel.

55.     In light of the foregoing, the Debtor is filing a motion to approve bridge

financing.  The Debtor has an immediate need to obtain the Bridge Facility to permit, among

other things, the orderly continuation of the operation of its business.  The limited Bridge

Facility is designed to provide additional time for the Debtor to market and negotiate DIP

financing on the best terms available and seek Court approval of a DIP facility.

56.     The Debtor needs immediate access to the $650,000 made available under

Bridge Facility to pay expenses that are necessary to continue operations for the next two weeks

as demonstrated by the cash forecast attached to the motion for bridge financing.  Those

expenses are limited to employee wages and benefits, taxes, and utilities as well as certain

expenses related to due diligence for the DIP financing the Debtor seeks.  None of Bridge

Facility proceeds will be used to pay professionals or to fund capital improvements.  Absent such

relief, the Debtor's estate will be immediately and irreparably harmed because without the

Bridge Facility the Debtor will have insufficient liquidity to operate and attempt to reorganize;

instead, the Debtor will be forced to liquidate its assets.

57.    Through the motion to approve bridge financing, the Debtor is requesting

entry of an order (i) authorizing the Debtor to obtain the Bridge Facility pursuant to the terms of

that Letter Agreement dated April 25, 2015 (the "Bridge Facility Agreement"), made by and

between PTC Group and the Debtor; (ii) granting an allowed, administrative priority claim for

any and all amounts borrowed by the Debtor under the Bridge Facility Agreement; (iii)

scheduling on an emergency basis, an interim hearing for this Court to consider entry of an

interim order authorizing the Debtor, on an interim basis, to borrow up to the aggregate amount

of $650,000; and (iv) scheduling a final hearing for this Court to consider entry of a final order

approving the Bridge Facility on a final basis on or after May 14, 2015.

### E.    Taxes

58.    In the ordinary course of its business, the Debtor is required to pay various

taxes and fees to federal, state, and local taxing authorities (the "Taxing Authorities"), including

but not limited to:  (i) sales, use, gross receipts, and federal excise taxes (the "Sales and Use

Taxes"); (ii) state, local, and federal employment and withholding taxes (the "Employment and

Withholding Taxes"); and (iii) certain other taxes, including income, personal property,

corporate franchise, real property, business license, and *ad valorem* taxes (the "Other Taxes"

and, collectively with the Sales and Use Taxes and the Employment and Withholding Taxes, the

"Taxes" and, together with any other type of taxes, fees, charges, penalties, or interest, the

"Taxes and Fees").[4]

---

[4]    The Debtor reserves all of its rights to contest the validity or amount of any taxes that may be alleged to be due.

59.     The Debtor, in the ordinary course of its business, is required to collect various Sales and Use Taxes in connection with the sale of goods and the purchase of materials and supplies from vendors.  The Debtor must remit the Sales and Use Taxes to the various governmental entities of the jurisdictions in which the Debtor conducts business.  The Debtor has yet to pay any Sales and Use Taxes due to the nature of the tax at issue and the current status of the Debtor's business.

60.     The Debtor, in the ordinary course of its business, collects Employment and Withholding Taxes as wages are earned by the Debtor's employees, and these taxes are calculated based on statutorily mandated percentages of earned wages.  The Debtor historically has paid timely all federal, state, and local Employment and Withholding Taxes to the relevant Taxing Authority through its payroll processing vendor, Automatic Data Processing, Inc.

61.     The Debtor, in the ordinary course of its business, incurs various Other Taxes, including, but not limited to, income, personal property, corporate franchise, real property, business license, and *ad valorem* taxes.  The process by which the Debtor remits such Other Taxes varies, depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is paid.

62.     Some of the states in which the Debtor operates have laws providing that, because the Taxes constitute "trust fund" taxes, the Debtor's officers and directors, or other responsible employees could, under certain circumstances, be held personally liable for payment of such Taxes.  To the extent any accrued Taxes of the Debtor are unpaid as of the Petition Date in these jurisdictions, the Debtor's officers and directors could be subject to lawsuits during the pendency of this Chapter 11 Case.  The Debtor believes that this would be extremely distracting for the Debtor's officers and directors, whose focus must be on the Debtor's business and

reorganization.  Consequently, the Debtor believes it is in its best interest and the best interest of its creditors to eliminate the possibility of such time-consuming and potentially damaging distractions by authorizing the Debtor to pay any undisputed prepetition Taxes to the respective Taxing Authorities in the ordinary course of business.

63.     The Debtor is requesting the entry of an order authorizing the Debtor, in its sole discretion, to pay any undisputed prepetition Taxes and Fees to the Taxing Authorities to which such Taxes are owed in the ordinary course of the Debtor's business, without prejudice to the Debtor's rights to contest the amounts of any Taxes on any grounds deemed appropriate.  To the extent that any transfers, deposits, or checks issued by the Debtor on account of prepetition Taxes did not clear as of the Petition Date, the Debtor also seeks an order directing banks and other financial institutions to honor and process such payments.

### III.     SUMMARY OF SECOND DAY MOTION RELATED TO INSURANCE

64.     In connection with the operation of its business, the Debtor is a beneficiary of multiple insurance policies (each an "Insurance Policy" and, collectively, the "Insurance Policies") maintained by PTC Group.  The Insurance Policies are maintained in amounts and types of coverage in accordance with the state and local laws in which the Debtor does business, as well as in accordance with its numerous contractual obligations.  The Insurance Policies provide coverage for, among other things, real property, directors and officers, general liability, automobile liability, crime insurance, fiduciary liability, marine cargo insurance, umbrella/excess liability, and employment practices liability.  For the policy period ending in 2015 and March 2016, the total annual premiums allocated to the Debtor for the Insurance Policies (the "Insurance Premiums") are approximately $118,003.

65.     The Insurance Premiums are paid by PTC Group, when due, from PTC Group's master operating account.  As a result of the payment, an intercompany charge is

booked against each of the subsidiary beneficiaries, including the Debtor, for its *pro rata* portion of the Insurance Premiums.  The Debtor does not have any direct obligations to its insurance carriers.

66.     In order to prevent any disruption of the Debtor's Insurance Policies and any attendant harm to the Debtor's business that such disruption would cause, the Debtor seeks authorization to pay, in its discretion, its *pro rata* portion of the prepetition Insurance Premiums to PTC Group through intercompany transactions and to perform any other prepetition obligations that may be necessary to maintain the Insurance Policies.

67.     The Debtor is requesting the entry of an order authorizing the Debtor to continue to pay its *pro rata* portion of PTC Group's obligations under the Insurance Policies through an intercompany transaction.  In light of the importance of maintaining the insurance coverage with respect to its business activities, the Debtor believes that it is in the best interests of its estate and creditors for this Court to authorize the Debtor to honor its *pro rata* share of the obligations under the Insurance Policies.  Any other alternative likely would require considerable cash expenditures, could result in the Debtor obtaining insurance coverage on less desirable terms than its existing coverage, and could be detrimental to the Debtor's restructuring efforts.

*[The remainder of this page was intentionally left blank.]*

Commonwealth of Pennsylvania

County of _Allegheny_

Peter Whiting
Chief Executive Officer
PTC Seamless Tube Corp.

Sworn to and subscribed
before me this _26th_ day
of _April_, 2015

_Lori A. Kosarko_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Lori A. Kosarko, Notary Public
Pine Twp., Allegheny County
My Commission Expires Nov. 19, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES