## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | Chapter 11 |
| PTC SEAMLESS TUBE CORP. f/k/a<br>PTC ALLIANCE PIPE ACQUISITION LLC, | Case No. 15-21445-TPA |
| Debtor. | |

| |
|---|
| PTC SEAMLESS TUBE CORP., |
| Movant, |
| v. |
| NO RESPONDENT. |

### EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 363, 364; (III) GRANTING LIENS, SECURITY INTERESTS, AND SUPERPRIORITY CLAIMS; AND (IV) SCHEDULING FINAL HEARING PURSUANT TO FED.R.BANKR.P. 4001 AND LOCAL RULES 4001-2 AND 9013-2

PTC Seamless Tube Corp. f/k/a PTC Alliance Pipe Acquisition LLC (the "Debtor"), the debtor and debtor-in-possession in the above-captioned case (this "Chapter 11 Case"), files this *Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364; (II) Granting Adequate Protection to Pre-Petition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 363 and 364; (III) Granting Liens, Security Interests, and Superpriority Claims; and (IV) Scheduling Final Hearing Pursuant to Fed.R.Bankr.P. 4001 and Local Rules 4001-2 and 9013-2* (the "Motion"). In support of this Motion, the Debtor relies on the *Declaration of Peter Whiting in Support of the Debtor's Chapter 11 Petition and First Day Motions* (the "First Day Declaration") and Declaration of Glenn Pollack of Candlewood Partners, LLC in support of the Motion (the

US_ACTIVE-121743355

"Pollack Decl."), which is attached as **Exhibit A**.  In further support of this Motion, the Debtor

respectfully represents as follows:

**JURISDICTION AND VENUE**

1.        The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper

in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.        The statutory predicates for the relief requested herein are sections 105,

361, 362, 363, and 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local

Rules 4001-2 and 9013-2.

**SUMMARY OF DIP FACILITY TERMS PURSUANT TO BANKRUPTCY RULE 4001(c)
AND LOCAL RULE 4001-2**

3.        The following description summarizes certain material provisions of the

DIP Facility and the Interim Order:

| | |
|---|---|
| **Borrower** | Debtor |
| **DIP Agent** | Black Diamond Commercial Finance, L.L.C. |
| **DIP Lenders** | The lenders from time to time party to the DIP Facility (defined below). |
| **Interim and Final Financing Commitment** | The DIP Facility consists of a delayed draw term loan in an amount not to exceed $5,000,000 on the terms set forth in the DIP Loan Documents (defined below), with an interim commitment of $3,000,000, conditioned upon entry of the Interim Order (together with any other obligation arising under the Interim Order, Final Order, and the DIP Loan Documents (as defined below), the "DIP Obligations").  *See* DIP Facility, ¶ 2.1. |
| **Interest Rate** | The outstanding loans and other obligations under the DIP Facility shall bear interest at the rate of 12% per annum, payable in cash on the last business day of each month.  Default interest shall accrue at an interest the rate of an additional 2% per annum.  *See* DIP Facility, ¶¶ 2.7, 2.8, 2.11(b). |
| **Term** | The term of the DIP Facility shall be for the period commencing from the closing and ending on the earliest:  (i) forty-five (45) days after the entry of the Interim Order by the Bankruptcy Court if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such forty-five (45) day period, (ii) one |

- 2 -

| | |
|---|---|
| | (1) calendar year from the Petition Date, (iii) the dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (iv) the consummation of the sale of substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code and (iv) the acceleration of the DIP Facility and the termination of the DIP Facility in accordance with the terms hereof. *See* DIP Facility, ¶ 2.15. |
| **Superpriority of DIP Obligations** | Pursuant to section 364(c)(1) of the Bankruptcy Code, all obligations of the Debtor under the DIP Loan Documents shall constitute allowed super-priority administrative expense claims (the "Superpriority Claims") in the Chapter 11 Case having priority over all administrative expenses of the kind specified sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out (as defined below). *See* Interim Order, ¶ 8. |
| **Liens and Priming Liens for DIP Lenders (Local Rule 4001-2(b)(1)(G))** | As security for the DIP Obligations, security interests and liens (the "DIP Liens") are granted to the DIP Agent, for the benefit of the DIP Credit Parties, pursuant to sections 364(c) and (d) of the Bankruptcy Code, in and upon all of the Debtor's pre-petition and post-petition real and personal property, and all proceeds thereof, whether such assets were in existence on the Petition Date or were thereafter created, acquired or arising and wherever located (all such real and personal property, including, without limitation, all Pre-Petition Collateral (as defined below) and the proceeds thereof, being collectively hereinafter referred to as the "DIP Collateral"); provided, however, that the DIP Collateral shall not include (i) the Debtor's rights in and to claims and causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, or 548 (the "Avoidance Actions"), or (ii) any recoveries obtained pursuant to Bankruptcy Code section 550 on account of any transfer that is avoided pursuant to the Avoidance Actions.  The DIP Liens shall have the following priority:<br><br>    (a)    DIP Liens on Pre-Petition Term Loan Collateral. The DIP Liens on all assets comprising Pre-Petition Term Loan Collateral shall be first priority priming liens senior in all respects to (i) the Pre-Petition Security Interests granted to the Pre-Petition Secured Lenders, (ii) any valid, binding, enforceable, fully-perfected liens junior to the liens and security interests of the Pre-Petition Secured Lenders on and in the Pre-Petition Term Loan Collateral, including without limitation any valid, binding, enforceable fully-perfected mechanics' liens that have attached to the DIP Collateral or may be perfected subsequent to the Petition Date as permitted under section 546(b) (and any liens granted after the commencement of the Chapter 11 Case to provide adequate protection in respect thereof), and (iii) the Adequate Protection Liens (as such terms are defined below); provided, however, the |

<table>
<tr><td></td><td>

DIP Liens shall be junior to (but only to)  (i) the Carve-Out and (ii) with respect to items of equipment that are the subject of capital leases as of the Petition Date, the interest of the lessor(s) in such equipment.

      (b)       <u>DIP Liens on Pre-Petition ABL Priority Collateral</u>. The DIP Liens on all assets comprising Pre-Petition ABL Priority Collateral shall be junior to (and only to) (i) the Pre-Petition ABL Security Interests, and (ii) the Carve-Out, and shall be senior to (i) the Pre-Petition Term Security Interests in the Pre-Petition ABL Priority Collateral, (ii) any valid, binding, enforceable, fully-perfected liens junior to the liens and security interests of the Pre-Petition Secured Lenders on and in the Pre-Petition ABL Priority Collateral (as such terms are defined below), including without limitation any valid, binding, enforceable fully-perfected mechanics' liens that have attached to the DIP Collateral or may be perfected subsequent to the Petition Date as permitted under section 546(b) (any liens granted after the commencement of the Chapter 11 Case to provide adequate protection in respect thereof), and (iii) the Adequate Protection Liens.

      (c)       <u>DIP Liens on Other Collateral</u>.  The DIP Liens on all DIP Collateral other than assets comprising Pre-Petition Collateral or the proceeds thereof shall be senior liens on, and security interests in, all such DIP Collateral senior to all other liens on, and security interests in, such DIP Collateral (including the Adequate Protection Liens); <u>provided</u>, <u>however</u>, that such DIP Liens shall be junior to (but only to) the Carve-Out.

      (d)       <u>DIP Liens Senior to Certain Other Liens</u>.  The DIP Liens and the Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtor, or (ii) subordinated to or made *pari passu* with any other lien or security interest granted under section 364 of the Bankruptcy Code or otherwise.

*See* Interim Order, ¶ 9.

</td></tr>
<tr><td>

**Permitted Uses (Local Rule 4001-2(b)(1)(F))**

</td><td>

The Debtor shall use the proceeds of the DIP Facility solely as provided in the Interim and Final Orders and in the DIP Loan Documents.  A copy of the Budget (as defined in the DIP Loan Documents) for the DIP Facility is attached hereto as **Exhibit B**.

</td></tr>
</table>

Notwithstanding anything herein, the Interim Order, or in any other order by this Court to the contrary, no portion of any DIP Facility loan proceeds, or other DIP Collateral proceeds may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of (other than payment of the Debtor's Professional Fees incurred in opposing such challenge) the liens or claims of any or all of the Pre-Petition Secured Lenders or DIP Lenders or the assertion of any claims or causes of actions (including any claims or causes of action under chapter 5 of the Bankruptcy Code) against any or all of the Pre-Petition Secured Lenders or DIP Lenders, or their respective advisors, agents, and sub-agents, including formal discovery proceedings in anticipation thereof.  The foregoing notwithstanding, no more than $15,000 in the aggregate of the amounts set forth in the Budget, any cash collateral, proceeds of the DIP Facility loans, or other DIP Collateral proceeds may be used by any Committee appointed in this Chapter 11 Case to investigate claims and/or liens of the Pre-Petition Secured Lenders or DIP Lenders.

The "Carve-Out" means (i) the amount of actual unpaid expenditures and disbursements for fees, costs, and disbursements of the Debtor's retained professionals (the "Debtor's Professional Fees") incurred before counsel for the Debtor receives a copy of the Carve-Out Trigger Notice so long as such Debtor's Professional Fees are (x) when added to the Debtor's Professional Fees already paid, not in excess of the total amount provided for Debtor's Professional Fees in the Budget for the period through and including the date upon which counsel for the Debtor receives a copy of the Carve-Out Trigger Notice and (y) ultimately allowed (whether such Debtor's Professional Fees are allowed before or after the delivery of a Carve-Out Trigger Notice), (ii) all unpaid the fees, costs, and disbursements of professionals for any statutory Committee, and for the members of such statutory Committee, appointed in the Chapter 11 Case employed by order of the Bankruptcy Court (collectively, the "Committee's Professional Fees" and, together with the Debtor's Professional Fees, the "Professional Fees") incurred before counsel for the Committee receives a copy of the Carve-Out Trigger Notice so long as such Committee's Professional Fees are (x) when added to the Committee's Professional Fees already paid, not in excess of the total amount provided for Committee's Professional Fees in the Budget for the period through and including the date upon which counsel for the Committee receives a copy of the Carve-Out Trigger Notice, and (y) ultimately allowed (whether such Committee's Professional Fees are allowed before or after the

| | |
|---|---|
| | delivery of a Carve-Out Trigger Notice), provided, further, that all such pre-Carve-Out Trigger Notice fees and expenses of the Committee and its advisors shall be capped at $50,000, (iii) all allowed and unpaid Debtor's Professional Fees (including Debtor's ordinary course professionals) that are incurred from and after the delivery of a Carve-Out Trigger Notice shall be capped at an aggregate amount not in excess of $400,000, (iv) all allowed and unpaid Committee's Professional Fees that are incurred from and after the delivery of a Carve-Out Trigger Notice shall be capped at an aggregate amount not in excess of $20,000, and (v) the payment of fees pursuant to 28 U.S.C. § 1930(a).  The amounts set forth in clauses (iii) and (iv) above are collectively referred to herein as the "Carve-Out Cap." |
| **Events of Default** | The DIP Facility provides the following Events of Default: (a) the Debtor's failure to make payments when due under the DIP Loan Documents; (b) the Debtor's breach of certain covenants, representations or warranties, or other defaults under the DIP Loan Documents, which are not cured within the applicable cure period; (c) the Debtor's default as to Other Indebtedness (as defined in the DIP Facility); (d) dismissal or conversion of the Chapter 11 Case; (e) the Debtor seeking to obtain a lien or claim that is senior to or *pari passu* with the DIP Liens, the DIP Superiority Claims, or the Replacement Liens; (f) entry of an order granting relief from stay with respect to certain assets of the Debtor; (g) entry of an order reversing, staying, vacating, or (without the written consent of the DIP Agent) otherwise amending, supplementing, or modifying the Interim or Final Orders; (h) entry of an order by the Bankruptcy Court allowing any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against the DIP Agent, any DIP Lender, or any of the DIP Collateral; (i) the Debtor filing a motion seeking, or the Bankruptcy Court entering, an order approving payment of any pre-petition claim other than as provided for in a First Day Order (as defined in the DIP Facility), or the Interim or Final Order, or as otherwise consented to by the DIP Agent; (j) the Debtor filing a plan of reorganization that the DIP Agent or Lenders vote to reject or a motion to approve the sale of substantially all of the Debtor's assets without payment in full of the DIP Obligations; (k) termination of exclusivity provided section 1121 of the Bankruptcy Code; (l) the Debtor's failure to defend against claims that challenge the validity of the DIP Agent or Lenders' claims; (m) judgments and attachments against the Debtor or its property, in excess of $1,000,000; (n) corporate dissolution of the Debtor; (o) unenforceability or impairment of any DIP Loan Document and the rights provided therein; (p) the occurrence of any Termination Event (as defined in the DIP Facility) that could reasonably be expected to subject the Debtor to |

| | |
|---|---|
| | liability individually in excess of $1,000,000; (q) waiver of the minimum funding standard under Section 412(c) of the Internal Revenue Code; (r) a change of control for the Debtor; (s) the occurrence of Environmental Matters (as defined in the DIP Facility) subjecting the Debtor to liability in excess of $1,000,000; (t) the failure to obtain entry of a Final Order approving this Motion within thirty (30) days following the date of entry of the Interim Order (or such later date as the DIP Agent may agree in its sole discretion); (u) the Debtor shall fail to comply with any provision of the Interim Order or the Final Order; (v) the Debtor's failure to provide a proposed Budget that is acceptable to the DIP Agent, within seven (7) days of the initial delivery to the DIP Agent of such Proposed Budget; (w) the Debtor's failure to achieve any of the milestones set forth on Schedule 8.1(z) to the DIP Facility; (x) the Budget Variance (as defined in the DIP Facility) for the Debtor exceeds 10%. *See* DIP Facility, ¶ 8.1. |
| **Relief from Stay** | The automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence of an Event of Default and the giving of five (5) business days' written notice provided for in the DIP Facility, all rights and remedies under the DIP Facility; provided, however, an order granting relief from the automatic stay must first be obtained before the DIP Lenders may proceed to foreclose on any DIP Collateral; provided, further, upon the occurrence of an Event of Default the DIP Lenders' right to have a motion to modify the automatic stay vacated and modified shall be heard on an emergency basis at the earliest possible opportunity. *See* Interim Order, ¶ 10(b). |
| **Stipulations and Admissions (Local Rule 4001-2(b)(1)(B) and (C))** | The stipulations and admissions contained in the Interim Order, including, without limitation, in paragraph 5 of the Interim Order, shall be binding upon the Debtor's estate and all other parties in interest, including, without limitation, any committee ("Committee") appointed in this Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code or a chapter 7 or chapter 11 trustee, unless (a) a party in interest that has obtained standing to do so has timely filed an adversary proceeding or contested matter by no later than the date that is the later of (x) one-hundred and twenty (120) days after the Petition Date in the Chapter 11 Case or (y) ninety (90) days from the date a Committee is appointed and retains counsel (i) challenging the validity, enforceability, priority, or extent of the Pre-Petition Secured Loan Obligations or the Pre-Petition Security Interests on the Pre-Petition Collateral (as such terms are defined below) or (ii) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims, or any other any claims, counterclaims, or causes of action, objections, contests, or |

| | |
|---|---|
| | defenses (collectively, "Claims and Defenses") against the Pre-Petition Secured Lenders or their affiliates, representatives, attorneys, or advisors in connection with matters related to the Pre-Petition Secured Loan Documents, the Pre-Petition Secured Loan Obligations, or the Pre-Petition Collateral, and (b) there is a final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter, provided that as to the Debtor, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date.  If no such adversary proceeding or contested matter is timely filed, (x) Pre-Petition Secured Loan Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense, or avoidance for all purposes in the Chapter 11 Case and any subsequent chapter 7 case, (y) the Pre-Petition Security Interests on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected, not subject to recharacterization, subordination, avoidance, or (except by payment) reduction, and (z) the Pre-Petition Secured Loan Obligations, the Pre-Petition Security Interests on the Pre-Petition Collateral, and the Pre-Petition Secured Lenders shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for the Debtor).  If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraph 5 of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Debtor's estate, any official Committee, any chapter 7 or 11 trustee, and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in an adversary proceeding or contested matter filed by such person or entity.  See Interim Order, ¶ 19. |
| **Waiver of Claims against DIP Lenders (Local Rule 4001-2(b)(1)(C))** | Without prejudice to the rights of any other party, including the Committee, if any, the Debtor has agreed to waive any and all claims and causes of action against the DIP Lenders, and their affiliates, directly related to the DIP Facility or the negotiation of the terms thereof in the DIP Facility.  See DIP Facility, ¶ 10.7(c). |
| **Adequate Protection/ Replacement Liens/Super-Priority Claims For Pre-Petition Secured Lenders** | The Pre-Petition Secured Lenders (as defined below) shall receive adequate protection in the form of:  (i) a replacement security interest in and lien upon all the DIP Collateral (the "Adequate Protection Liens"), of the same type and category in which they had Pre-Petition Security Interests (such collateral, the "Replacement Collateral"), subordinate to the DIP Liens and the Carve-Out, and (ii) subject to the payment of the Carve-Out, a |

| | |
|---|---|
| | superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the Superpriority Claims held by the DIP Lender; provided, however, that the Pre-Petition Secured Lenders shall not receive or retain any payments, property, or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have indefeasibly been paid in cash in full. *See* Interim Order, ¶ 14. |
| **DIP Fees** | The DIP Facility provides that the Debtor shall pay: <br><br> (i)    a Closing Fee equal to one percent (1%) of the Aggregate Term Loan Commitment.  Such fee shall be fully earned and payable as follows: (x) on the date of entry of the Interim Order, one percent (1%) of the Interim Availability Amount and (y) on the Final Order Entry Date, one percent (1%) of the excess of the Aggregate Term Loan Commitment over the Interim Availability Amount; <br><br> (ii)    the fees set forth in the letter agreement (the "<u>Fee Letter</u>") between the Administrative Agent and the Borrower dated May 4, 2015, payable at the times and in the amounts set forth therein[1]; and <br><br> (iii)    a monthly non-use fee equal to one percent (1%) per annum on the amount by which the Aggregate Term Loan Commitment in effect from time to time exceeds the Term Loan Obligations in effect from time to time (as such terms are defined in the DIP Facility). <br><br> *See* DIP Facility, ¶ 2.11(C). |
| **Waiver of Discharge** | The DIP Obligations will not be discharged under any chapter 11 plan confirmed in the Debtor's Chapter 11 Case.  *Id.* at ¶ 2.18 |

---

[1]    Because the Fee Letter contains confidential business information of BDCF, the Debtor has not attached a copy of it to the Motion.  The Debtor will disclose the amount of all fees charged thereunder to the United States Trustee and counsel for the Committee, once appointed, following execution of a confidentiality agreement.  Additionally, the Fee Letter will be made available at the Interim Hearing for *in camera* review should the Court desire.

## BACKGROUND

### A.  The Chapter 11 Filing

4.  On April 26, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court").

5.  The Debtor continues in the management and operation of its business and property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or Committee has been appointed in this chapter 11 case (the "Chapter 11 Case").

6.  Information regarding the Debtor and this Chapter 11 Case, including the Debtor's business, corporate structure, financial condition, and the reasons for and objectives of this Chapter 11 Case, is set forth in the First Day Declaration, filed on the Petition Date and incorporated herein by reference.

### B.  Pre-Petition Capital Structure

7.  As of the Petition Date, the Debtor's total funded secured debt obligations totaled approximately $161 million which obligations consist of a revolving credit facility (the "Pre-Petition ABL Facility") payable to Wells Fargo Bank, National Association (the "Pre-Petition ABL Lender") and term loans payable to certain lenders (collectively, the "Pre-Petition Term Lenders" and, together with the ABL Lender and their respective agents, the "Pre-Petition Secured Lenders") for which Credit Suisse AG, Cayman Islands Branch serves as administrative and collateral agent (the "Pre-Petition Term Agent").  *See* First Day Declaration, ¶ 12.  These obligations are detailed below.

(e)      The Pre-Petition ABL Facility.  On or about December 19, 2012, the Debtor and certain of PTC's subsidiaries, as borrowers; the institutions from time to time party thereto as lenders, *i.e.*, the Pre-Petition ABL Lender; and Wells Fargo Bank, National Association, as administrative agent and collateral agent to the Pre-Petition ABL Lender (the "Pre-Petition ABL Agent"), entered into a Credit Agreement (the "Pre-Petition ABL Loan Agreement") providing a revolving credit facility in an aggregate principal amount not to exceed $75,000,000.  The Pre-Petition ABL Loan Agreement, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, financing statement, pledge, assignment, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "Pre-Petition ABL Loan Documents."

(f)      Pre-Petition ABL Collateral.  Pursuant to the Pre-Petition ABL Loan Documents, the Debtor granted to Pre-Petition ABL Agent, for the benefit of the Pre-Petition ABL Lenders, (x) first priority liens on and security interests in all ABL Priority Collateral (as defined in that certain Intercreditor Agreement, dated as of December 19, 2012, among Pre-Petition ABL Agent and Pre-Petition Term Agent (as at any time amended, the "Pre-Petition Intercreditor Agreement"))[2] owned by the Debtor (all such ABL Priority Collateral in existence on the Petition Date, or the identifiable proceeds thereof, the "Pre-Petition ABL Priority Collateral") and (y) second priority liens on and security interests in all Term Loan Priority Collateral (as defined in the Pre-Petition Intercreditor Agreement)[3] owned by the Debtor

---

[2]      Generally, the Pre-Petition ABL Priority Collateral is the Debtor's inventory, accounts, and other working capital assets.

[3]      Generally, the Pre-Petition Term Priority Collateral is the Debtor's property, plant, equipment, and other fixed assets.

(all such Term Loan Priority Collateral in existence on the Petition Date, or the identifiable proceeds thereof, the "Pre-Petition Term Priority Collateral" and together with the Pre-Petition ABL Priority Collateral, the "Pre-Petition Collateral", and such liens and security interests granted to the Pre-Petition ABL Agent on the Pre-Petition Collateral, collectively, the "Pre-Petition ABL Security Interests").

(g)      The Pre-Petition Term Loans.  On or about December 19, 2012, PTC Group, as borrower; PTC Holdings II Corp. (the parent of PTC Group); the institutions from time to time party thereto as lenders, *i.e.*, the Pre-Petition Term Lenders; and the Pre-Petition Term Agent, as administrative and collateral agent for the Term Loan Lenders, entered into a Credit Agreement (the "Pre-Petition Term Loan Agreement"), providing for a credit facility in the aggregate principal amount not to exceed $120,000,000, which consisted of two tranches of loans (the "Pre-Petition Term Loans") in the amounts of $70,000,000 and $50,000,000 maturing on December 19, 2016 and December 19, 2018, respectively.  The Pre-Petition Term Loan Agreement, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, financing statement, pledge, assignment, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "Pre-Petition Term Loan Documents" and, collectively, the Pre-Petition Term Loan Documents and Pre-Petition ABL Loan Documents shall be referred to as the "Pre-Petition Loan Documents".  The Debtor was initially a guarantor of payment of all obligations owed under the Pre-Petition Term Loan Documents.  Pursuant to that certain Amendment No. 1, Consent and Forbearance Agreement dated as of April 26, 2015 (the "Pre-Petition Term Loan Amendment"), the Pre-Petition Loan Documents were amended to provide, among other things,

that the claim of the Pre-Petition Term Lenders against the Debtor on account of the Debtor's

guarantee of payment of the obligations owed under the Pre-Petition Term Loan Documents

would be limited to the value of the Pre-Petition Term Loan Collateral (as defined herein) owned

by the Debtor.  The Pre-Petition Term Lenders and their proportionate share of the loans are set

forth in the Debtor's Schedule D.  The Pre-Petition Term Lenders with the largest shares of the

Term Loans include:  affiliates of Black Diamond Capital Management LLC ("Black Diamond")

and affiliates of Redwood Capital Management, LLC.

(h)     Pre-Petition Term Loan Collateral.  Pursuant to the Pre-Petition Term

Loan Documents, the Debtor granted to Pre-Petition Term Agent, for the benefit of the Pre-

Petition Term Lenders, (x) first priority liens on and security interests in all Term Loan Priority

Collateral and (y) second priority liens on and security interests in all ABL Priority Collateral

(all such liens and security interests granted to the Pre-Petition Term Loan Agent on the Pre-

Petition Collateral, collectively, the "Pre-Petition Term Loan Security Interests" and,

collectively, the Pre-Petition Term Loan Security Interests and the Pre-Petition ABL Security

Interests shall be referred to as the "Pre-Petition Security Interests").

8.     The Debtor submits that the Pre-Petition Security Interests granted to the

Pre-Petition Secured Lenders are (A) valid, binding, perfected, enforceable, liens, and security

interests in the Pre-Petition Collateral and (B) not subject to avoidance, recovery, reduction,

disallowance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable

nonbankruptcy law and, (C) if this Motion is approved, (x) in the case of the Pre-Petition

Security Interests in the Pre-Petition Term Priority Collateral, subject and subordinate only to

(i) the DIP Liens (as defined below), (ii) the Carve-Out (as defined below), and (iii) valid,

perfected and unavoidable liens permitted under the Pre-Petition Secured Loan Documents to the

extent such permitted liens are senior to or pari passu with the liens of the Pre-Petition Secured

Lenders on the Pre-Petition Collateral, (y) in the case of the Pre-Petition Term Loan Security

Interests in the Pre-Petition ABL Priority Collateral, subject and subordinate only to (i) the Pre-

Petition ABL Security Interests, (ii) the DIP Liens (as defined below), (iii) the Carve-Out (as

defined below), and (iv) valid, perfected and unavoidable liens permitted under the Pre-Petition

Secured Loan Documents to the extent such permitted liens are senior to or pari passu with the

liens of the Pre-Petition Secured Lenders on the Pre-Petition Collateral, and (z) in the case of the

Pre-Petition ABL Security Interests in the Pre-Petition ABL Priority Collateral subject and

subordinate only to valid, perfected and unavoidable liens permitted under the Pre-Petition ABL

Loan Documents to the extent such permitted liens are senior to or pari passu with the Pre-

Petition ABL Security Interests.

        9.      The Debtor further submits that:

        (a)      As of the Petition Date, the Debtor was justly and lawfully

indebted and liable to the Pre-Petition ABL Lenders, without defense, counterclaim, recoupment

or offset of any kind, in the aggregate principal amount of $43,800,000 in respect of loans made

by Pre-Petition ABL Lenders pursuant to, and in accordance with the terms of, the Pre-Petition

ABL Loan Documents, plus, interest thereon and all other obligations incurred in connection

therewith as provided in the Pre-Petition ABL Loan Documents (the "Pre-Petition ABL

Obligations").  The Pre-Petition ABL Loan Obligations and the Pre-Petition ABL Loan

Documents constitute the legal, valid, and binding obligations of the Debtor, enforceable in

accordance with their terms (other than in respect of the stay of enforcement arising from section

362 of the Bankruptcy Code).  No portion of the Pre-Petition ABL Obligations is subject to

avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or

Claim (as defined in the Bankruptcy Code) pursuant to the Bankruptcy Code or applicable nonbankruptcy law.  The Debtor does not have, and hereby forever releases, waives and discharges, any Claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the Pre-Petition ABL Credit Parties or any of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates and that arise out of or relate to any of the Pre-Petition ABL Loan Documents or any acts, inaction, or transactions thereunder at law or in equity.

      (b)     As of the Petition Date, the principal amount of all obligations owed to the Pre-Petition Term Lenders pursuant to the Pre-Petition Term Loan Documents, without defense, counterclaim, recoupment or offset of any kind, was $117,000,000 (the "Total Term Loan Amount").   But for the execution of the Pre-Petition Term Loan Amendment, the Debtor would have been liable for the full amount of the Total Term Loan Amount without defense, counterclaim, recoupment or offset of any kind plus, interest thereon and all other obligations incurred in connection therewith as provided in the Pre-Petition Term Loan Documents.  As a result of the Pre-Petition Term Loan Amendment, the Pre-Petition Term Credit Parties have a valid claim against the Debtor in an amount equal to the value of the Pre-Petition Collateral owned by the Debtor (such amount, the "Debtor's Pre-Petition Term Loan Obligations" and collectively with the Pre-Petition ABL Obligations, the "Pre-Petition Secured Loan Obligations").  The Debtor's Pre-Petition Term Loan Obligations and the Pre-Petition Loan Documents (including, without limitation, the Pre-Petition Term Loan Amendment) constitute the legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms

(other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy

Code).  No portion of the Debtor's Pre-Petition Term Loan Obligations is subject to avoidance,

recharacterization, recovery, subordination, attack, offset, counterclaim, defense or Claim (as

defined in the Bankruptcy Code) pursuant to the Bankruptcy Code or applicable nonbankruptcy

law.  The Debtor does not have, and hereby forever releases, waives and discharges, any Claims

(as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights,

whether arising under the Bankruptcy Code or otherwise, against the Pre-Petition Term Credit

Parties or any of their respective present and former predecessors, successors, assigns, affiliates,

members, partners, managers, current and former equity holders, officers, agents, employees,

attorneys and affiliates and that arise out of or relate to any of the Pre-Petition Term Loan

Documents (including, without limitation, the Pre-Petition Term Loan Amendment) or any acts,

inaction, or transactions thereunder at law or in equity.

       10.    As of the Petition Date, the aggregate outstanding amount of the Pre-

Petition Secured Loan Obligations (approx. $161 million) exceeded the value of the Pre-Petition

Collateral securing those obligations.  Prior to the Petition Date, the Debtor received an appraisal

dated February 27, 2015, performed by Hilco Real Estate Appraisal, LLC, valuing its real

property in Hopkinsville at $5,460,000 on an as-is basis, and at $8,660,000 once construction is

complete.  Additionally, the Debtor valued the equipment and machinery at the Hopkinsville

plant on the Petition Date at $83,452,356.61.  *See* Pollack Decl., ¶ 10.

       11.    PTC Group Holdings Corp. ("PTC Group"), the Debtor's direct parent,

operates a centralized cash management system for itself and the PTC Group subsidiaries.

Historically, the Debtor's operations and capital expenditures were funded by loans made by

PTC Group.  Such loans were funded by a combination of PTC Group revenues and draws on the

ABL Facility.  Each loan was booked on the books of PTC Group and the Debtor.  As of the

Petition Date, the total amount of outstanding loans made by PTC Group to the Debtor is

approximately $80 million.  *See* First Day Declaration, ¶ 13.

### C.    The Debtor's Efforts to Obtain Financing

12.    As discussed in the First Day Declaration, due to the uncertainty with

timing and costs to complete construction of the Hopkinsville plant, PTC Group is unwilling to

continue to fund the Debtor.  *See* First Day Declaration, ¶¶ 24-25.  The Debtor filed this Chapter

11 Case to obtain breathing room from its creditors so that it may better evaluate what will be

required to finance and complete construction of the plant to enable the Debtor to produce tubes.

*Id.*  Ultimately, the Debtor believes that completing construction on the plant to enable it to

produce tube will provide the greatest recovery to the estate and its creditors.  *Id.* at ¶ 25.

13.    Since February of 2015, Candlewood has provided financial advisory

services to the Debtor.  *See* Pollack Decl., ¶ 9.  The Debtor's lack of revenue due to the

incomplete plant in Hopkinsville and the delays and cost overruns in the construction of that

plant have created a liquidity crisis for the Debtor.  *Id.*  Due to the uncertainty of the costs to

complete construction of the Hopkinsville plant, PTC Group is unwilling to continue to fund the

Debtor.  *Id.  See also* First Day Declaration, ¶ 24.  Also, the ABL Lender is unwilling to finance

the Debtor's construction of the Hopkinsville plant.  *Id.*

14.    Shortly before the Petition Date, due to the Debtor's lack of liquidity and

need for financing, the Debtor instructed Candlewood to solicit potential lenders for DIP

financing facility.  *See* Pollack Decl., ¶ 11.  Because the Debtor is continuing to develop its

strategy to finance the completion of the Hopkinsville plant to enable it to produce tubes, the

Debtor sought a DIP financing facility in the amount of five million dollars ($5,000,000), the

- 17 -

amount required to give the Debtor the breathing room necessary to finalize its plans for

completing  and financing the construction of the Hopkinsville plant sufficient to produce tubes.

*Id.*

15.      As of the Petition Date, the Debtor had no cash and a single account

receivable in the amount of $17,911.50.  Thus, the Debtor is unable to continue operating or fund

its reorganization efforts.  *Id.* at ¶ 19.

16.      The Debtor estimates that this process of finalizing a strategy and securing

financing for construction could take approximately seven (7) months.  *Id.* at ¶ 12.

17.      Candlewood, with the assistance of Reed Smith LLP, proposed counsel to

the Debtor, prepared a proposed DIP term sheet proposing a $5,000,000 secured DIP facility, to

be secured by, *inter alia*, a priming lien on certain assets of the Debtor, a first-priority lien on

unencumbered assets, and a junior lien on certain assets of the Debtor to those of the proposed

DIP Facility.  *Id.* at ¶ 13.  Candlewood also prepared a confidential information memorandum.

Candlewood sent solicitation packages which included the proposed DIP Term Sheet, the

confidential information memorandum, and the appraisal of the Debtor's real property to

eighteen (18) potential DIP lenders that Candlewood determined were the most likely candidates

to provide the DIP financing required by the Debtor.  *Id.*

18.      Since the Debtor filed its Chapter 11 Case, Candlewood has received

inquiries from four (4) additional potential DIP lenders.  Candlewood contacted such potential

DIP Lenders and provided them with the DIP term sheet.  *Id.* at ¶ 14.

19.      Black Diamond Commercial Finance, L.L.C. ("BDCF") expressed interest

in providing DIP financing.  *Id.* ¶ 15.  BDCF is an affiliated entity of the majority equity holders

of PTC Group's ultimate parent entity as well as the largest holders of the Pre-Petition Term

Loans, which are Black Diamond affiliated entities.    BDCF provided Candlewood and Debtor

with a term sheet.  *Id.*  After arm's length negotiation between the parties, the Debtor and BDCF

reached agreement on the terms of the DIP Facility for which the Debtor is seeking Bankruptcy

Court approval.  *Id.* at ¶ 16.

       20.    Candlewood reviewed the terms of the DIP facilities proposed by BDCF

and DIP LLC and concluded that BDCF's proposed DIP Facility contains the most favorable

terms available to the Debtor.  *Id.* at ¶ 17.

       21.    Based on Candlewood's efforts to obtain DIP financing for the Debtor, the

limited responses of the potential DIP lenders, and its experience obtaining loan facilities for

companies in financial distress, Candlewood believes that the Debtor cannot obtain the necessary

financing on terms more favorable than those offered by BDCF under the DIP Facility.  *Id.* at

¶ 18.

**RELIEF REQUESTED**

       22.    By this Motion, the Debtor respectfully requests that the Court enter an

order:

       (a)    authorizing the  Debtor to obtain postpetition financing pursuant to

that certain *Secured Super-Priority Debtor-In-Possession Credit Agreement* (the "DIP Facility",

together with any related documents or agreements, the "DIP Loan Documents") substantially in

the form of the agreement attached as **Exhibit C**, up to the aggregate principal amount of

$5,000,000 (the actual available principal amount at any time being subject to the conditions and

restrictions set forth in the DIP Loan Documents) from BDCF, acting as administrative agent (in

such capacity, the "DIP Agent"), for itself and a syndicate of financial institutions (together, the
"DIP Lenders" and, together with the DIP Agent, the "DIP Credit Parties"):[4]

   (b)  granting a superpriority administrative claims pursuant to section
364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kind specified
in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out;

   (c)  granting a priming lien on all Pre-Petition Collateral subordinate
only to (i) the Carve-Out, (ii) with respect to the Pre-Petition ABL Priority Collateral, the Pre-
Petition ABL Security Interests, and (iii) with respect to items of equipment that are the subject
of capital leases as of the Petition Date, the interest of the lessor(s) in such equipment and senior
to the Pre-Petition Security Interests on the Pre-Petition Collateral (other than the Pre-Petition
ABL Security Interests on the Pre-Petition ABL Priority Collateral) and any lien on the Pre-
Petition Collateral that is junior to the Pre-Petition Security Interests including, without
limitation, any purported mechanics' liens (for the avoidance of doubt, the Pre-Petition ABL
Security Interests on the Pre-Petition ABL Priority Collateral shall not be primed by the DIP
Liens or the Carve-Out);

   (d)  granting a first priority lien on all other assets of the Debtor (other
than Avoidance Actions) subject only to the Carve-Out;

   (e)  scheduling, on an emergency basis pursuant to Bankruptcy Rule
4001 and Local Rules 4001-2 and 9013-2, an interim hearing (the "Interim Hearing") on this
Motion for this Court to consider entry of an interim order in the form annexed to the Motion
(the "Interim Order") as **Exhibit D**, among other things, (i) authorizing the Debtor, on an interim

---

[4]  Capitalized terms not defined herein shall have the meanings assigned to them in the DIP Loan Documents.

basis, to borrow up to the aggregate amount of $3,000,000, and (ii) granting the adequate

protection hereinafter described;

(f)     scheduling a final hearing (the "<u>Final Hearing</u>") for this Court to

consider entry of a final order authorizing the balance of the DIP Facility on a final basis, as set

forth in this Motion and the DIP Loan Documents attached to this Motion, within thirty (30) days

of the entry of the Interim Order; and

(g)     the granting of certain related relief.

## BASIS FOR REQUESTED RELIEF

### A.     Applicable Authority

23.     Pursuant to Section 364(c) of the Bankruptcy Code, a debtor may, in the

exercise of its business judgment, incur secured debt if the debtor has been unable to obtain

unsecured credit and the borrowing is in the best interests of the estate.  *In re Simasko

Production*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where

debtors' best business judgment indicated financing was necessary and reasonable for benefit of

estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to

postpetition credit, courts "permit debtors-in-possession to exercise their basic business

judgment consistent with their fiduciary duties"); *see also* Collier on Bankruptcy, ¶ 364.05 (15th

ed. rev.).   Section 364(c) of the Bankruptcy Code provides, in pertinent part:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(1) of this title as an administrative expense, the
> court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt –
>
> (1)     with priority over any or all administrative expenses of the
> kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not
> otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

24.    Courts have articulated a three-part test to determine whether a debtor in possession is entitled to financing under Section 364(c) of the Bankruptcy Code: (i) whether the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim; (ii) whether the credit transaction is necessary to preserve the assets of the estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa, 1991); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37- 39; *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987); *In re Secured Storage Systems*, No. 91-14262S, 1992 WL 109064, at *1 (Bankr. E.D. Pa. May 15, 1992).

25.    Section 364(d)(1) of the Bankruptcy Code provides that if a debtor-in-possession is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or in accordance with section 364(c) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the debtor-in-possession to obtain credit or incur debt secured by a senior lien on property of the estate subject to a lien if:

(A)    the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

26.    Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain debtor-in-possession financing and provides, in relevant part:

The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.

> If the motion so requests, the court may conduct a hearing before
> such 14-day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

*See* Bankruptcy Rule 4001(c)(2).

### B.    Approval Of The DIP Facility Is Warranted Under These Circumstances

(i)    *The Debtor's Need for Financing*

27.    The Debtor has an immediate need to obtain the DIP Facility and use the Pre-Petition Collateral, in order to permit, among other things, the orderly continuation of the operation of its business, to make payroll, and to satisfy other needs.  As set forth in the First Day Declaration, the Debtor has reduced its workforce to nineteen (19) employees, which it believes are necessary to its reorganization process.  These employees are employed for the purposes of, *inter alia*, maintaining the Debtor's assets, developing a business strategy, planning remaining construction of the plant, and assisting with the financial and other reporting obligations of the Debtor.  As set forth in the attached Budget, the Debtor needs a cash infusion to continue with its operations.  The DIP Facility will provide the Debtor with the necessary breathing room required to plan and secure financing for the remaining construction needed for to allow the Hopkinsville plant to produce tubes, which the Debtor believes will maximize the value of its assets for the benefit of the estate.

(ii)    *The Debtor's Efforts to Obtain Financing*

28.    As discussed above, the Debtor's undisputed, Pre-Petition Secured Obligations far exceed the value of the Pre-Petition Collateral.  In light of this, and the Debtor's current financial situation, Candlewood has concluded that sufficient financing on an unsecured or junior priority basis pursuant to sections 364(b) and (c) of the Bankruptcy Code is unobtainable for the Debtor.   Based upon the responses received by the potential DIP lenders,

the Debtor believes that the financing arrangement proposed under the DIP Facility, which

includes DIP Liens that prime certain Pre-Petition Security Interests, as described more fully

above, represents the best available option to the Debtor.

29.     Accordingly, the Debtor seeks approval of the DIP Facility and the

priming DIP Liens as authorized under sections 363(c) and (d) of the Bankruptcy Code.

Critically, the Pre-Petition Term Lenders have consented to such priming of their Pre-Petition

Security Interests by the DIP Liens.  Pursuant to the terms of the Pre-Petition Intercreditor

Agreement between the Pre-Petition Term Lenders and the Pre-Petition ABL Lenders, the Pre-

Petition ABL Lenders have also consented to the priming of their Pre-Petition Security Interests

in the Pre-Petition Term Collateral on the terms provided by the DIP Facility.  As discussed

more fully below, the interests of the Pre-Petition Secured Lenders are adequately protected

under the terms of the Interim Order.

30.     The Debtor submits that the DIP Facility has been negotiated and offered

in good faith by the DIP Credit Parties, and the DIP Credit Parties should be accorded the

benefits of section 364(e) of the Bankruptcy Code.  The Debtor is a wholly-owned subsidiary of

PTC Group.  PTC Holdings I Corp. is the ultimate parent of PTC Group.  The majority

shareholders of PTC Holdings I Corp. are affiliates of BDCF (the proposed DIP

Agent).  Additionally, BDCF affiliates are the largest holders of the Pre-Petition Term Loans.

The terms for DIP financing proposed by BDCF were more favorable than those offered by other

parties, the negotiations on behalf of the Debtor were led by Candlewood and Debtor's counsel,

and all such negotiations were conducted at arm's length.

(iii)   *Approval of the DIP Facility is in the Best Interest of the Estate and Its Creditors*

31.     The Debtor believes that the terms of the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.   Bankruptcy Courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money.  *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. at 449 ("Business judgments should be left to the board room and not this Court"); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estates, and threaten the court's ability to control a case impartially.").

32.     The DIP Facility will provide the liquidity necessary to fund the operations of the Debtor while the Debtor develops a strategy for the completion of the Hopkinsville plant sufficient to produce tube, obtaining financing for such construction, and developing a plan of reorganization of the Debtor.  The Debtor submits that, without the DIP Facility, it will be forced to liquidate its assets and that there will be no assets made available for distribution to unsecured creditors.  The Debtor's estate and its creditors will be irreparably harmed.  The Debtor believes that through completion of construction sufficient to produce tube, the Debtor will generate a greater return for the estate and its creditors than if a liquidation were to occur at this time.  Consummation of the DIP Facility in accordance with this Motion is, therefore, in the best interest of the Debtor's estate.

(iv)    *The Pre-Petition Lenders Are Adequately Protected*

33.     Section 363(e) of the Bankruptcy Code provides that, on request of an

entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition

such use as necessary to provide adequate protection of such interest.  Additionally, section

364(d) of the Bankruptcy Code requires that adequate protection be provided where, as here, the

certain of the liens and security interests of the Pre-Petition Secured Lenders in the DIP

Collateral are being primed to secure the obligations under the DIP Facility.

34.     What constitutes adequate protection is a question of fact that is to be

determined by the court on a case-by-case basis.  *In re Rocco*, 319 B.R. 411 (Bankr. W.D. Pa.

2005).  It was the intent of Congress in Section 361 to give courts flexibility to fashion relief in

light of each case in general equitable principals.  *In re Wilson*, 30 B.R. 371 (Bankr. E.D. Pa.

1983).   As a result, courts have developed general principles to guide the adequate protection

determination.  What constitutes adequate protection is determined on a case-by-case basis, and

the equitable factors which the court might consider include:  (1) whether the claim is over or

under-secured, (2) the parties reasonable expectations, (3) the quality of the collateral, (4) the

length of the stay, (5) whether the lien value is stable, depreciating or appreciating, (6) whether

taxes and other payments are being made on the collateral, and (7) whether the debtor has a high

or low chance of reorganization.  *See In re Briggs Transp. Co*., 780 F.2d 1339 (8th Cir. 1985).

35.     As adequate protection for any diminution in the value of the Pre-Petition

Collateral resulting from (i) the DIP Liens priming the Pre-Petition Secured Lenders Pre-Petition

Security Interests on the DIP Collateral and (ii) the imposition of the automatic stay pursuant to

section 362(a) of the Bankruptcy Code, the Debtor has agreed that the Pre-Petition Secured

Lenders should be granted, subject to the Carve-Out, a replacement lien (*i.e.* the Adequate

Protection Lien) junior to the liens of the DIP Facility on all of the DIP Collateral, *i.e.,* the

Replacement Collateral (maintaining, as between the Pre-Petition Secured Loans, the relative priority of the Pre-Petition Secured Loans as set forth in the Intercreditor Agreement).

36.     Here, the factors weigh in favor of approving the requested adequate protection. The Pre-Petition Secured Loan Obligations are undersecured and, therefore, subject to further diminution in value as a result of the priming liens. Additionally, it is unclear at this time how long it may take for the Debtor to reorganize. The purpose of the proposed DIP Facility is to allow the Debtor sufficient time to develop a strategy for the financing and completing the plant to enable it to make tubes. The Debtor believes that, in so doing, the Debtor will likely increase the value of the plant and, therefore, increase the value of the Pre-Petition Collateral. Based on the foregoing, the Debtor submits that such adequate protection is reasonable under the circumstances and should be approved.

37.     In addition, as noted above, the amount of the Pre-Petition Secured Loan Obligations far exceeds the value of the Pre-Petition Collateral. Accordingly, any purported lien or security interest in the Pre-Petition Collateral that is junior to the Pre-Petition Security Interests of the Pre-Petition Secured Lenders (including, without limitation, any purported mechanic's liens) constitute unsecured claims for which no adequate protection is necessary.

      (v)     *Approval of the DIP Facility on an Interim Basis is Necessary to Avoid Immediate and Irreparable Harm*

38.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate. *See* Local Rule 4001-2.

39.    Based upon the foregoing, the Debtor requests entry of an Interim Order approving the DIP Facility on an interim basis and authorizing the Debtor to obtain credit under the DIP Facility in the amount of $3,000,000.  Absent granting the relief sought by the Interim Order, the Debtor's estate will be immediately and irreparably harmed because without the DIP Facility the Debtor will have insufficient liquidity to operate and it will be forced to liquidate.

40.    The Debtor further requests that the Court conduct a Final Hearing on the Motion, following notice to parties in interest as discussed below, within thirty (30) days of entry of the Interim Order.

**NOTICE**

41.    Notice of this Motion has been given by facsimile and/or overnight delivery to the following parties or, in lieu thereof, to their counsel:  (i) the Office of the United States Trustee; (ii) all secured creditors or, as applicable, their administrative agent (iii) the Debtor's twenty (20) largest unsecured creditors; (iv) BDCF; (v) all persons that have asserted liens against the Debtor's property; (vi) the Debtor's landlord; (vii) applicable taxing authorities; and (vii) all parties that have filed a request for notices under Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

42.    The Debtor respectfully requests that it be authorized to serve a copy of the Interim Order, if approved by the Court, which fixes the time and date for filing objections, if any, and schedules the Final Hearing by U.S. first-class mail upon the following parties or, in lieu thereof, to their counsel:  (i) the Office of the United States Trustee; (ii) all secured creditors or, as applicable, their administrative agent; (iii) the Debtor's twenty (20) largest unsecured creditors; (iv) BDCF; (v) all persons that have asserted liens against the Debtor's property; (vi)

the Debtor's landlord; (vii) applicable taxing authorities; (viii) all parties who have filed requests

for notice under Bankruptcy Rule 2002; and (ix) all other parties ordered by the Court.  The

Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice

under Bankruptcy Rule 4001 and Local Rule 4001-2.

## **REQUEST FOR EXPEDITED HEARING**

43.     The Debtor believes that just cause exists to support its request for an

expedited hearing on this Motion.  The Debtor filed its petition for relief under Chapter 11 of the

Bankruptcy Code one week from the date hereof and the Debtor filed this Motion as

expeditiously as possible under the circumstances.  Absent an expedited hearing on this matter,

the Debtor, its estate, and creditors would be harmed because the Debtor's ability to access cash

or to receive financing to continue daily operations would cease.  The need for an expedited

hearing has not been caused by the lack of due diligence by the Debtor or its counsel.

WHEREFORE, the Debtor respectfully requests that the Court enter an order,

substantially in the form attached hereto as **Exhibit D**, and grant such other and further relief as

may be just and proper.

Dated:  May 4, 2015                                  Respectfully submitted,

                                                     REED SMITH LLP

                               By:    */s/ Joseph D. Filloy*_____
                                      Eric A. Schaffer (PA ID No. 30797)
                                      Luke A. Sizemore (PA ID No. 306443)
                                      Joseph D. Filloy (PA ID No. 310167)
                                      Reed Smith Centre
                                      225 Fifth Avenue, Suite 1200
                                      Pittsburgh, PA 15222
                                      Telephone:  (412) 288-3131
                                      Facsimile:  (412) 288-3063
                                      Email:  eschaffer@reedsmith.com
                                      Email:  lsizemore@reedsmith.com
                                      Email:  jfilloy@reedsmith.com

                                      *and*

                                      Kurt Gwynne
                                      Reed Smith LLP
                                      1201 Market Street, Suite 1500
                                      Wilmington, DE 19801
                                      Telephone:  (302) 778-7550
                                      Email:  kgwynne@reedsmith.com

                                      *Proposed Counsel to Debtor and Debtor-in-
                                      Possession*